RECEIVED

JAN 16 2020

AT 8:30_____M
WILLIAM T. WALSH, CLERK

FILED

JAN 16 2020

AT 8:30  4:45  P M
WILLIAM T. WALSH
CLERK

SRC

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| v. | : | Criminal No. 20- 51 (SRC) |
| | : | |
| BOAZ MANOR, | : | 18 U.S.C. § 1349 |
| a/k/a "Shaun MacDonald," and | : | 18 U.S.C. § 1343 |
| EDITH PARDO, | : | 15 U.S.C. §§ 78j(b) & 78ff |
| a/k/a "Edith Pardo Mehler" | : | 17 C.F.R. § 240.10b-5 |
| a/k/a "Edith Mehler" | : | 18 U.S.C. § 2 |

## INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud – 18 U.S.C. § 1349)

### Individuals, Entities, and Definitions

1.      At all times relevant to this Indictment:

a.      Defendant Boaz Manor, a/k/a "Shaun MacDonald," ("MANOR") was a resident of Toronto, Canada or New York, New York. In or around January 2003, MANOR co-founded and managed Portus Alternative Asset Management Inc. ("Portus"), a hedge fund based in Toronto, Canada. In or around 2005, Canadian securities regulators stepped in and froze Portus's assets amid concerns that company funds had been misappropriated. In connection with MANOR's work at Portus and the subsequent criminal investigation, in or around May 2011, MANOR pled guilty to one count of transferring monies in breach of trust/laundering the proceeds of a crime and one count of disobeying a court order. MANOR was sentenced to four years in

prison and was released after spending approximately one year in prison. In or around 2012, MANOR reached a settlement with the Ontario Securities Commission that required MANOR to pay disgorgement of CA$8.8 million and banned MANOR from serving in a number of roles in the securities industry in Ontario, including, subject to certain exceptions, acquiring and trading securities and becoming or acting as a director or officer of an issuer, registrant, or investment fund manager, or acting as a registrant, investment fund manager, or promoter.

b.     Defendant Edith Pardo, a/k/a "Edith Pardo Mehler," a/k/a "Edith Mehler" ("PARDO"), was a resident of Bloomfield, New Jersey. MANOR recruited PARDO to participate in the scheme described below, including by falsely representing to victims that she was an independently wealthy investor.

c.     CG Blockchain, Inc. was a company headquartered in New York, New York that purported to offer various blockchain-based and cryptocurrency-related technology platforms (hereinafter, together with affiliated entities, including BCT Inc., referred to as "CGB"). In or around January 2014, following MANOR's release from prison, MANOR began work on a business plan that involved creating a crisis management tool for hedge funds. MANOR's business began operating under the name CG Blockchain Inc. and the product MANOR sought to create was called "ComplianceGuard." According to marketing material, ComplianceGuard purported to provide hedge funds with "real-time blockchain auditing" by "encod[ing] transaction data into

2

a uniform and consolidated repository, providing automated updates to
financial audits, in real-time."

       d.     "Public Relations Firm 1" was a public-relations firm with
locations in Newport Beach, California and New York, New York.

       e.     "Individual 1" resided in New York and was listed on CGB
marketing material as the company's President.

       f.     An "initial coin offering" or "ICO" was a type of fundraising
event in which an entity offered participants a unique digital "coin" or "token"
in exchange for consideration. The consideration often came in the form of
"digital currency" or "crypto currency," but could also be "fiat currency," which
was a term used to describe currency that a government had declared to be
legal tender, such as the U.S. dollar or the Euro, but was not backed by a
physical commodity.

       g.     "Digital currency" or "cryptocurrency" was a digital
representation of value that could be digitally traded and functioned as (1) a
medium of exchange, (2) a unit of account, or (3) a store of value, but did not
have legal tender status. Unlike fiat currency, digital currency was not issued
by any jurisdiction and functions only by agreement within the community of
users of that particular currency. Examples of digital currencies are "Bitcoin"
and "Ethereum," both of which were issued and distributed on their own
"blockchains."

       h.     A "blockchain" was a digitalized, decentralized,

cryptographically-secured ledger that allowed market participants to keep track of transactions without central recordkeeping.

i.      The "tokens" or "coins" issued in an ICO were issued and distributed on a blockchain. Tokens often were also listed and traded on online platforms, typically called digital currency exchanges, and they usually traded for other assets. Often, tokens were listed and tradeable immediately after they were issued.

j.      ICOs were typically announced and promoted through the internet and email. In order to participate in the ICO, investors were generally required to transfer funds to the issuer. After the completion of the ICO, the issuer would distribute its unique "coin" or "token" to the participants. The tokens entitled the holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, or voting rights. Sometimes these tokens were also listed on online digital currency exchanges and were tradeable for digital currencies.

k.      An "investment contract" was an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. An investment contract was a security as defined by Section 2(a)(1) of the Securities Act of 1933 ("Securities Act") and Section 3(a)(10) of the Securities Exchange Act of 1934 ("Exchange Act"). Investments in the CGB ICO were investment contracts, and therefore

"securities" as defined by Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

## The Conspiracy

2.      From in or around January 2014 through in or around December 2018, in the District of New Jersey, and elsewhere, defendants

**BOAZ MANOR,
a/k/a "Shaun MacDonald," and
EDITH PARDO,
a/k/a "Edith Pardo Mehler,"
a/k/a "Edith Mehler,"**

knowingly and intentionally conspired and agreed with others to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice to defraud, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, and sounds, contrary to Title 18, United States Code, Section 1343.

## Goal of the Conspiracy

3.      The goal of the conspiracy was for MANOR and PARDO to enrich themselves by engaging in a fraudulent scheme to solicit investment in CGB by making material misrepresentations and omissions concerning their personal and professional backgrounds, their roles at CGB, CGB's business relationships with other individuals and companies, and the use and functionality of CGB's products.

5

## **Manner and Means of the Conspiracy**

4.    It was part of the conspiracy that:

a.    MANOR began using a variety of aliases, including the alias "Shaun MacDonald," to hide his true identity and prior criminal conviction from potential CGB investors and employees. MANOR also changed his appearance by darkening his hair and growing a beard. In addition, MANOR obtained and used an identification card with the name Shaun MacDonald.

b.    MANOR secured a significant portion, if not all, of the initial seed money in CGB from a close family member. In order to conceal the source of this seed money, MANOR recruited PARDO, who had knowledge of MANOR's true identity and criminal past, to act as a conduit for the money. The Defendants misrepresented to potential CGB investors and employees that PARDO was an independently wealthy investor who provided approximately $3 million in seed money to CGB.

c.    To further conceal the source of CGB's initial funding and to attempt to further legitimize CGB, in or around December 2015, the Defendants entered into an agreement to purchase Public Relations Firm 1. The Defendants used Public Relations Firm 1 to misrepresent their employment history to potential CGB investors and employees. For example, PARDO and MANOR (using the alias "Shaun MacDonald") listed themselves on Public Relations Firm 1's website as the company's "CEO and Managing Director" and "VP of Business Development," respectively. MANOR's biography

6

on Public Relations Firm 1's website failed to disclose his true identity, his prior criminal conviction, and his ban by the Ontario Securities Commission.

      d.     In or around June 2017, the Defendants began misrepresenting to potential CGB clients that PARDO was considering purchasing a hedge fund that invests in a variety of other hedge funds (a "fund of funds"). In discussions regarding the purchase of a particular fund of funds, MANOR and PARDO misrepresented that PARDO was willing to invest millions of dollars of her own money to buy the fund of funds.

      e.     In or around 2017, MANOR and PARDO secured agreements with approximately twenty hedge funds whereby the hedge funds agreed to lease ComplianceGuard from CGB in exchange for PARDO investing $200 million in each leasing hedge fund upon PARDO's acquisition of a fund of funds. Under these agreements, once the leasing hedge fund received the approximately $200 million investment from PARDO, the leasing hedge fund would be obligated to pay CGB a fee for ComplianceGuard of approximately $1 million per year for three years. PARDO never acquired a fund of funds, and, as a result, no hedge fund ever paid CGB in connection with its lease of ComplianceGuard.

      f.     None of the twenty hedge funds paid any fees to CGB for their use of ComplianceGuard and many of the hedge funds did not receive or did not use ComplianceGuard at all. The Defendants, however, misrepresented to potential CGB investors the nature of CGB's relationship with these hedge

7

funds and the hedge funds' use of ComplianceGuard.

g.    For example, as a result of MANOR's misrepresentations, a CGB employee stated in an email to a potential investor: "The fees are $83,000 per month, or $996,000 per year, per fund. So with the current 20 hedge funds, this means there's already $20mm/year revenue stream. The contracts as you will see have a minimum term of three years. So a guaranteed 3 year income of $60mm, with just these first 20 funds."

h.    In or around August 2017, CGB launched an ICO. Shortly thereafter, in or around late 2017, CGB began marketing the "Blockchain Terminal" to potential investors. The "Blockchain Terminal" was purportedly a computer terminal that allowed hedge funds and financial institutions to trade and manage cryptocurrency using a single integrated interface. According to CGB marketing material, the "Blockchain Terminal" contained a number of cryptocurrency and blockchain-related software applications, including CGB's ComplianceGuard product.

i.    Although MANOR continued to run CGB during the ICO and actively marketed CGB's "BCT Token" to investors, the Defendants failed to disclose MANOR's role at CGB in marketing material. During this period, Individual 1 was listed as the company's President. Individual 1, however, did not have access to CGB's financial information, and was not able to make decisions on behalf of the company without the approval of MANOR or PARDO.

j.    CGB, in marketing material during this period, also made

8

misrepresentations about hedge funds' use of the Blockchain Terminal.  For

example, in marketing material about Blockchain Terminal sent to potential

investors, a section entitled "Actual Clients" stated that "[o]ur live beta is

installed at 20 hedge funds." The Blockchain Terminal, however, was not

installed at twenty hedge funds during this period.

    k.  In or around May 2018, CGB publicly announced that CGB

had closed its ICO and raised approximately $30 million, which was composed

of cryptocurrency and fiat currency.

    l.  After CGB had raised approximately $30 million, CGB

investors learned of MANOR's true identity and criminal past. MANOR

recognized the significance of his misrepresentations, admitting to an investor

on or about September 25, 2018 that he had hidden his real identity and

background because the investor would have relayed that information to others

resulting in "the company being destroyed."

   All in violation of Title 18, United States Code, Section 1349.

### COUNTS TWO THROUGH FOUR
### (Wire Fraud – 18 U.S.C. § 1343)

1.      The allegations contained in Paragraphs One and Four of Count

One are re-alleged and incorporated as though fully set forth herein.

2.      From in or around January 2014 through in or around December

2018, in the District of New Jersey, and elsewhere, defendants

**BOAZ MANOR,**
**a/k/a "Shaun MacDonald," and**
**EDITH PARDO,**
**a/k/a "Edith Pardo Mehler,"**
**a/k/a "Edith Mehler,"**

knowingly and intentionally devised a scheme and artifice to defraud, and to

obtain money and property by means of materially false and fraudulent

pretenses, representations, and promises, and, for the purpose of executing and

attempting to execute such scheme and artifice, did transmit and cause to be

transmitted by means of wire, radio, and television communication in interstate

and foreign commerce writings, signs, signals, and sounds, as set forth more

fully below, each such wire transmission constituting a separate count of this

Indictment:

| Count | Approximate Date | Description |
|:---:|:---:|:---|
| 2 | February 16, 2018 | Wire transfer of approximately $500,000 from Victim 1's account at UBS to a JPMorgan Chase account in PARDO's name |
| 3 | July 2, 2018 | Wire transfer of approximately $100,000 from Victim 2's account at First Republic Bank to a JPMorgan Chase account in PARDO's name |
| 4 | August 2, 2018 | Wire transfer of approximately $40,000 from Victim 3's account at Wells Fargo to a JPMorgan Chase account in PARDO's name |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FIVE
### (Securities Fraud – 15 U.S.C. § 78j(b))

1.     The allegations contained in Paragraphs One and Four of Count

One are re-alleged and incorporated as though fully set forth herein.

2.     From in or around January 2014 through in or around December

2018, in the District of New Jersey, and elsewhere, defendants

**BOAZ MANOR,**
**a/k/a "Shaun MacDonald," and**
**EDITH PARDO,**
**a/k/a "Edith Pardo Mehler,"**
**a/k/a "Edith Mehler,"**

unlawfully, willfully and knowingly, directly and indirectly, by the use of the

means and instrumentalities of interstate commerce, and of the mails, and of

facilities of national securities exchanges, would and did use and employ, in

connection with the purchase and sale of securities, manipulative and deceptive

devices and contrivances by: (a) employing devices, schemes, and artifices to

defraud; (b) making untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading; and

(c) engaging in acts, practices and courses of business which operated and would

operate as a fraud and deceit upon persons in violation of Title 15, United States

Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section

240.10b-5, and Title 18, United States Code, Section 2, to wit, MANOR and

PARDO made, and caused to be made, false statements, misrepresentations, and

material omissions, soliciting individuals throughout the world, including in the

12

District of New Jersey, to invest in CGB which purported to offer various blockchain-based and cryptocurrency-related technology platforms, and thereby caused individuals in the United States and elsewhere to purchase BCT tokens, resulting in the receipt of approximately $30 million of investor funds into CGB-related bank accounts, as described in Paragraph Four of Count One.

## FORFEITURE ALLEGATION

1.      The allegations contained in all paragraphs of this Indictment are hereby realleged and incorporated by reference for the purpose of noticing forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      As a result of committing the offenses charged in Counts One through Five of this Indictment, defendants

**BOAZ MANOR,**
**a/k/a "Shaun MacDonald," and**
**EDITH PARDO,**
**a/k/a "Edith Pardo Mehler,"**
**a/k/a "Edith Mehler"**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses charged in Counts One through Five, and all property traceable thereto.

## Substitute Assets Provision

3.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided

without difficulty;

the United States shall be entitled, pursuant to 21 U.S.C. § 853(p) (as

incorporated by 28 U.S.C. § 2461(c)), to forfeiture of any other property of the

defendant up to the value of the above-described forfeitable property.

A TRUE BILL

FOREPERSON

CRAIG CARPENITO
United States Attorney

CASE NUMBER: 20 - 51 (SRC)

# United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

BOAZ MANOR,
a/k/a "Shaun MacDonald," and
EDITH PARDO,
a/k/a "Edith Pardo Mehler"
a/k/a "Edith Mehler"

## INDICTMENT FOR

18 U.S.C. §§ 1349, 1343
15 U.S.C. §§ 78j(b) and 78ff
17 C.F.R. § 240.10b-5
18 U.S.C. § 2

A True Bill

_____
Foreperson

CRAIG CARPENITO
*UNITED STATES ATTORNEY*
*NEWARK, NEW JERSEY*

CATHERINE R. MURPHY
VIJAY DEWAN
*ASSISTANT U.S. ATTORNEYS*
*(973) 297-2098*